# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT GREENEVILLE

LISA NIDIFFER JENNINGS,

     Plaintiff,

v.

UNIVERSAL PROTECTION SERVICE, LLC
d/b/a ALLIED UNIVERSAL SECURITY
SERVICES,

     Defendant.

Civil Action No. 2:24-cv-205
DCLC-CRW

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION, OR TO STAY PROCEEDINGS PENDING ARBITRATION

Plaintiff, Lisa Jennings, through counsel, submits her Response in Opposition to Defendant's Motion to Compel Arbitration and to Dismiss Plaintiff's Complaint, or in the Alternative, Motion to Stay Proceedings Pending Arbitration. As grounds for her opposition to Defendant's motion, Ms. Jennings states that there is no valid or enforceable arbitration agreement in existence because she never signed or otherwise assented to any arbitration agreement. Even if such an agreement had been signed, it would be unenforceable because it lacked mutual assent and Defendant failed to provide the promised opt-out opportunity. Ms. Jennings asks this Court to deny Defendant's motion to dismiss and compel arbitration or, alternatively, allow her to present evidence at trial on whether an enforceable arbitration agreement exists.

## I. Relevant Facts.[1]

In June 2019, Ms. Jennings was hired as a Security Supervisor by Vinson Guard Service and assigned to work at the Koch Foods Debone Facility in Morristown, Tennessee. Her immediate supervisor was Don Yordy. In the fall of 2019, she learned that Allied Universal Security was acquiring Vinson Guard and that Vinson employees could transition to become Allied employees while continuing to perform the same security services under the contract with Koch Foods. By this time, Ms. Jennings had already filed a charge of discrimination against her employer after learning from a male coworker that Mr. Yordy was trying to find reasons to fire her because she is female and he did not want female security supervisors. [Jennings Decl. ¶¶ 1-4]

Mr. Yordy instructed Ms. Jennings that she would need to attend a mandatory meeting in Knoxville with Allied personnel if she wanted to keep her job and become an Allied employee. The meeting was scheduled for after work hours from 6-8 p.m. in Knoxville, which was about an hour's drive from her location in Morristown. Ms. Jennings drove with another Vinson Guard employee, Faith Evans, to attend the meeting in Knoxville. Ms. Evans and Ms. Jennings were the only Vinson employees from the Morristown location who were required to attend this meeting, and they are the only female employees at that Morristown location. The male security guards who worked in Morristown became Allied employees without attending this meeting. [Jennings Decl. ¶¶ 5-9]

Ms. Jennings was not provided with any documents from Allied prior to the meeting. [Jennings Decl. ¶ 7] All onboarding information was presented during the meeting. The onboarding meeting lasted one to two hours. Most of the meeting consisted of Allied employees giving presentations. A relatively short amount of time was spent on Allied's laptop computers

---

[1] Lisa Jennings Decl. attached as Exhibit 1; Faith Evans Decl. attached as Exhibit 2.

scrolling through documents and entering basic information. Ms. Jennings denies that she was instructed to create unique credentials to access information on the computer with a username and password. When she finished scrolling on the computer, the computers remained on. She did not log off because she had never logged on with a password. She was not given a personal account or access to this system or documents after leaving the meeting. [Jennings Decl. ¶¶10-13, 29]

Ms. Jennings denies seeing, reading, or signing an arbitration agreement on the computer at the onboarding meeting. [Jennings Decl. ¶¶ 14] Nor was there any discussion at the meeting with Allied representatives about an arbitration agreement, even though they guided employees as a group through some of the material. Ms. Jennings recently reviewed the arbitration agreement that Allied claims she signed at this meeting. Even after seeing it, she still denies reviewing or signing it at the onboarding meeting. [Jennings Decl. ¶¶ 15-6] Likewise, her coworker, Faith Evans, who attended the meeting with her also denies seeing or signing an arbitration agreement. [Evans Decl. ¶¶ 11, 14]

Further, Ms. Jennings states that if she had signed this arbitration agreement, then she would have taken the steps to opt out of the agreement. [Jennings Decl. ¶¶ 17] The agreement requires employees to sign it, but they are not allowed to opt out at that same time. Instead, the agreement states that the 30-day deadline to opt out starts when the employee *receives* a copy of the binding agreement, not when the employee reviews and signs the agreement because that is not an option. [Def's Exh.2, PageID 90, 95; Jennings Decl. ¶ 22] Thus, even if Ms. Jennings had signed the arbitration agreement at the onboarding meeting, she would have been prohibited from opting out at the meeting, and she could not have opted out after the meeting until she received a copy of the agreement with its lengthy, detailed instructions explaining how to opt out. [Jennings

3

Decl. ¶¶ 25]  Allied, however, did not give Ms. Jennings a copy of the signed arbitration agreement or access to an online version of it. [Jennings Decl. ¶24]

Allied personnel did not distribute copies of documents to employees during the meeting. Employees did not take any paperwork when they left, and Allied did not provide them with online access to onboarding documents or an arbitration agreement after the meeting. Employees could not download or save any information they reviewed because the computers belonged to Allied.  Ms. Jennings had no access to the Emptech system or an online account where she could review the onboarding documents later. Likewise, the eHub software contained only pay and benefits information and did not contain the arbitration agreement or other documents from the onboarding process. [Jennings Decl. ¶¶ 18-22]

Even if Allied had included the arbitration agreement in its onboarding material, its method of onboarding made it impossible for Ms. Jennings to read every page, let alone understand everything or remember detailed opt-out instructions from a specific page within a voluminous amount of material presented. It was an overwhelming amount of information riddled with complicated legal documents that she was required to sign or lose her job. As reflected in Allied's Exhibit C, those documents alone consist of 55 pages but also refer to hundreds of additional pages of material. Allied held this meeting in the evening, required Ms. Jennings to drive an hour each way, crammed in presentations during the limited time to review material, expected her to race through and sign voluminous, dense documents under threat of termination before she could leave to drive home at night, and then never provided her with copies or access to the agreements that it now asks this Court to enforce. [Jennings Decl. ¶¶ 27-28]

Additional relevant facts below from Defendant's exhibits, including the declaration of Allied employee Amy Reingold, are disputed by Ms. Jennings' and Ms. Evans' declarations:

In paragraph 9.a., Reingold states that the welcome letter sent to acquisition employees like Ms. Jennings "contain express instructions regarding how to initiate the onboarding process via the Emptech system, including information regarding how to access the Emptech portal and that employee's unique login credentials (username and password)." The *sample* Welcome Letter she attaches as Exhibit A, however, includes no such information. Moreover, it is clear from this sample welcome letter that it is supposed to be sent to employees before the onboarding meeting to give the employee time to review the material in advance of onboarding. Ms. Jennings did not receive a welcome letter with access credentials to view documents before the meeting. [Jennings Decl. ¶ 7]

Likewise, in Paragraph 9.c. of Reingold's declaration, she explains how acquisition employees, as soon as they access the Emptech system, are asked to verify that they had sufficient time to review documents. [Def.'s Exhibit A, PageID 72-73] This again demonstrates that employees are supposed to be given access to documents with ample time to review them before they are asked to sign them. This is not what occurred with Ms. Jennings and Ms. Evans. [Jennings Decl. ¶¶ 7, 27-28; Evans Decl. ¶7-8, 16]

Reingold's declaration at paragraph 9.d. confirms that there are multiple Allied employees and agents ("a group") who have authority to access other employees' onboarding documents in their Emptech accounts, even though employees' themselves cannot access these accounts after they complete the onboarding process.[2] [Def.'s Exh. A, PageID 73; Jennings Decl. ¶ 24; Evans Decl. ¶16]

---

[2] In Paragraph 9.b, it appears that "unique credentials" are merely the employees last name and either social security number or an Employee ID issued by Allied. [Def.'s Exhibit A, PageID 72] Such "credentials" are easily accessible by any Allied employee with access to employee files. Indeed, Ms. Jennings states that someone at Allied clearly entered (incorrect) information onto a job application form within her Emptech account. [Jennings Decl. par. 30]

5

Much of the information discussed and attached to Reingold's declaration consists of recent "examples" of documents rather than actual documents from the relevant time or from Ms. Jennings employment file. Reingold does not assert that she attended the onboarding of Ms. Jennings or has first-hand knowledge of or involvement with that process in 2019.

Likewise, in paragraph 9.j., Reingold speculates or presumes that "prior to completing each onboarding document, including the Agreement, each employee has the opportunity to (1) review the document's contents, (2) request a hard copy from the attending HR representative, and/or (3) change the information provided." [Def.'s Exhibit A, PageID 78] Her statement is simply false with respect to the actual onboarding process of Ms. Jennings. [Jennings Decl. ¶¶ 7, 18-22, 24, 27-28]

Again, in paragraph 9.k., Reingold speculates and testifies incorrectly with respect to Ms. Jennings' onboarding process when she states, "Once an acquisition employee has completed all of the onboarding tasks, she may view copies of her executed documents and save or print the documents for her own records." [Jennings Decl. ¶ 18-19]

Again, at paragraph 9.l., it is a misrepresentation for Ms. Reingold to testify that "The onboarding process cannot be completed if the Agreement is left unreviewed and the acquisition employee does not sign it or opt-out." Employees are prohibited from opting out during the onboarding process. The only choice is for the employee to sign the agreement (or for someone else to sign it for the employee) regardless of whether the employee has had adequate time to review it. [Jennings Decl. ¶ 22; Def's Exh.2, pageID 90, 95]  In exchange for the signature on the arbitration agreement during the onboarding process, Allied promises to give the employee 30 days to opt out of the agreement by following detailed instructions contained within the signed

6

agreement. Even if Ms. Jennings had signed the agreement, which she denies, Allied did not give her the promised opportunity to opt out. [Jennings Decl. ¶ 22-26]

## II. Law And Argument.

### A. Standard of Review.

Under the Federal Arbitration Act, district courts must compel arbitration of claims covered by a valid arbitration agreement. 9 U.S.C. § 4. However, "[n]o matter how strong the federal policy favors arbitration, 'arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration.'" *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) (quoting *United Steelworkers of Am. v. Gen. Fireproofing Co.*, 464 F.2d 726, 729 (6th Cir. 1972)). The burden of proof that an arbitration agreement exists is on the party seeking arbitration. *Bazemore v. Papa John's United States, Inc.*, 74 F. 4th 795, 798 (6th Cir. 2023) (reversing the district court's holding that the burden of proof was on the party opposing arbitration); *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F. 4th 832, 839 (6th Cir. 2021); *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 195 (6th Cir. 2016).

In evaluating a motion to compel arbitration, the district court is to "treat the facts as [it] would in ruling on a summary judgment motion, construing all facts and reasonable inferences that can be drawn therefrom in a light most favorable to the non-moving party." *Great Earth Cos. v. Simon*, 288 F.3d 878, 889 (6th Cir. 2002) ("In order to show that the validity of the agreement is 'in issue,' the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate. The required showing mirrors that required to withstand summary judgment in a civil suit.") (internal citation omitted). If there is any genuine issue of material fact about the validity of the agreement, the district court "shall proceed

summarily to the trial thereof." 9 U.S.C. § 4; *Boykin,* 3 F.4th at 837. Accordingly, the district court first "must engage in a limited review to determine whether the dispute is arbitrable." *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)).

### B.  No Valid Arbitration Agreement Exists.

A party's testimony that she has not seen an arbitration agreement is sufficient for a reasonable finder of fact to conclude that she did not sign it, thus calling into question the existence of a valid agreement. *Bazemore*, 74 F.4th at 798; *Nestle Waters N. Am., Inc. v Bollman*, 505 F.3d 498, 504 (6th Cir. 2007) ("Arbitration under the Federal Arbitration Act is a matter of consent, not coercion.").  Ms. Jennings' testimony denying that she saw or signed the agreement, corroborated by Ms. Evans testimony, together with evidence undermining Defendant's credibility related to the onboarding process, is sufficient for this Court to deny Defendant's motion to compel arbitration or, at a minimum, allow a trial on whether an enforceable arbitration agreement exists. *Id*.; s*ee also Hergenreder v. Bickford Senior Living Grp.*, LLC, 656 F.3d 411, 415, 418–19 (6th Cir. 2011).

Defendant correctly states that the existence of a valid arbitration agreement deprives the district court of subject matter jurisdiction. [Defendant's Memorandum of Law, Doc. 15-1, at 5]. Defendant then argues that Ms. Jennings "unmistakably" assented to the terms of the agreement by electronically signing it when Defendant knows that Ms. Jennings denies signing the agreement. [Defendant's Memorandum of Law, Doc. 15-1, at 8]. In support of that proposition, Defendant cites a case "recognizing the validity of electronic signatures under Tennessee's Uniform Electronic Transactions Act." [Defendant's Memorandum of Law, Doc. 15-1, at 8]. Ms.

8

Jennings does not dispute that electronic signatures are valid under the Act cited by Defendant; however, the Act does not apply when a party did not, in fact, sign the agreement in question. Defendant then merely mimics the language of the disputed agreement itself, stating that "Plaintiff had as much time as she needed to review the document, was permitted to ask questions about it before signing, and acknowledged that she understood and read the entire agreement." [Defendant's Memorandum of Law, Doc. 15-1, at 8]. That is simply untrue in this case as Ms. Jennings testifies in detail in her declaration attached as Exhibit 1.

Defendant's other arguments are likewise based on fallacy. Defendant acknowledges that Ms. Jennings has affirmatively denied signing the agreement and contends that even if she (or someone else) had affixed her electronic signature to the agreement, she would have opted out within the thirty days allowed by the agreement. Defendant claims that these representations by Ms. Jennings are "a fabrication." [Defendant's Memorandum of Law, Doc. 15-1, at 11]. Ms. Jennings, however, has demonstrated that many of the representations about the onboarding process made by Defendant's Human Resources Director, Amy Reinhold, in her Declaration in support of Defendant's motion are either fabricated, speculative, lack first-hand knowledge, or misrepresent the facts. The procedures set forth in Ms. Reinhold's Declaration may state the customary procedures for onboarding by Defendant, but they do not represent what actually occurred in this case during the onboarding of Ms. Jennings and her co-worker, Faith Evans. Ms. Reinhold was not present or involved in the onboarding process in Knoxville in November 2019. Therefore, her declaration merely speculates about how the onboarding process should work.

Defendant relies on case law from the Sixth Circuit stating that it is insufficient for a plaintiff to avoid an arbitration agreement based simply on the bare assertion that the plaintiff does not recall signing such an agreement. [Defendant's Memorandum of Law, Doc. 15-1, at 13-

9

14]. Defendant cites and, in fact, provides a lengthy block quote from *Tucker v. United Wholesale Mortg., Inc.*, No. 24-1595, 2025 WL 1082316, at *3 (6th Cir. Apr. 10, 2025). There, the court acknowledged that when the party moving to enforce the arbitration agreement relies on evidence outside of the pleadings, such as the Declaration of Ms. Reinhold relied upon by Defendant in this case, the district court should apply the summary judgment standard of Federal Rule of Civil Procedure 56 in deciding the issue. *Id*. The *Tucker* court then opined about what constitutes a genuine issue of material fact: "It does not suffice, for example, for a claimant merely to testify that he "does not 'remember' signing an arbitration contract or receiving information about arbitration." By contrast, an "unequivocal denial" that the individual signed the agreement may create a genuine dispute over whether someone agreed to arbitrate." *Id.* at *4 (citations omitted).

Defendant also cites *Gavette v. United Wholesale Mortg., LLC*, No. 24-1557, 2025 WL 318224, at *3 (6th Cir. Jan. 28, 2025) and *iQor Holdings US LLC*, No. 22-3142, 2022 WL 18836540 (6th Cir. July 29, 2022) in which the Sixth Circuit affirmed the district court's dismissal of the plaintiff's lawsuit and enforced the arbitration agreement where the plaintiff "did not remember" signing an arbitration agreement. Both of these cases are also readily distinguishable from the facts of the instant case. In *Gavette*, the employee created his own username and password on the onboarding website and electronically signed the arbitration agreement using the credentials he had created. 2025 WL 318224 at *9. Similarly, in *Durm:*

> As a completely separate part of the job application process all applicants [were] presented with an Arbitration Agreement. All applicants enter[ed] an email address and create[d] a password. After this initial step, they [were] directed to complete the job application. All applicants electronically sign[ed] the Arbitration Agreement by clicking "I Agree," and then by typing in the last four digits of their social security number, as well as their month and day of birth.

2022 WL 219323, at *4-5.

As the Declarations of Ms. Jennings and Ms. Evans describe, the circumstances under which Ms. Jennings purportedly signed an arbitration agreement with Defendant were dramatically different than the circumstances in the cases cited by Defendant. Moreover, an unknown number of people had access to her employment file, including the arbitration agreement. Tellingly, a document from Emptech purporting to be Ms. Jennings' employment application contains misinformation that was clearly not provided by her, which is evidence that someone acting on behalf of Defendant entered information on Ms. Jennings' employment records without her permission. If that could occur on an employment application, then, to quote Defendant "it strains reason" to believe it could not have occurred with respect to the arbitration agreement as well.

Ms. Jennings has affirmatively declared, under oath, that she did not see or sign an arbitration agreement. She does not state that she "does not recall" or "did not understand" about signing an arbitration agreement. She denies signing any such agreement. Accordingly, under *Tucker*, one of the cases relied on by Defendant, there is at minimum an issue of fact here, and Ms. Jennings is entitled to an evidentiary hearing for the Court to determine whether an enforceable arbitration agreement exists. 9 U.S.C. § 4; *Rent-A-Center West, Inc. v. Jackson*, 561 U.S. 63, 70 n.1; *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1; *Boykin*, 3 F.4th at 837; *Garren v. CVS Health Corp.*, No. 3:17-cv-149, 2018 U.S. Dist. LEXIS 115277, at *10 (E.D Tenn. July 11, 2018).

### C. No Mutual Assent Occurred Because Ms. Jennings Did Not Knowingly Waive Her Rights and Defendant Failed to Provide Meaningful Opt-Out Opportunity as Promised.

Even assuming, for the sake of argument, that Ms. Jennings signed the arbitration agreement at the onboarding meeting but does not remember signing it, the agreement is still not

11

valid or enforceable because there was no mutual assent. As Ms. Jennings explains throughout her declaration that she was not provided with documents to review in advance of the meeting, and under the circumstances of that meeting, it was impossible to read all of the information in the short time allowed. She cannot knowingly waive her rights or assent to an arbitration agreement when Defendant failed to provide her with adequate time to review the information.

Likewise, after claiming that Ms. Jennings' signed the agreement, Defendant's failure to provide her with a signed copy containing the terms and instructions for opting out of the agreement would have undermined her ability to exercise her right to opt out of the agreement thereby nullifying any alleged agreement for lack of mutual assent. Ms. Jennings has testified that if she had seen and signed the arbitration agreement, then she would have chosen to opt out of the agreement. Because she never received a signed copy of the agreement with instructions to opt out, Ms. Jennings was deprived of a meaningful opportunity to reject the agreement, and no mutuality of assent occurred under Tennessee law. *See Garren v. CVS Health Corp.*, No. 3:17-cv-149, 2018 U.S. Dist. LEXIS 115277, at *10 (E.D Tenn. July 11, 2018). Because the Court must take all facts and reasonable inferences in Ms. Jennings's favor at this juncture, it should have no difficulty concluding she has shown a genuine issue of material fact as to whether an enforceable arbitration agreement exists.

**Conclusion**

Based on Ms. Jennings' testimony denying that she saw or signed the agreement, which was corroborated by similar testimony from her coworker, together with evidence undermining Defendant's credibility related to the onboarding process, and evidence that there was no mutuality of assent to form the agreement, this Court should deny Defendant's motion to compel

arbitration. In the alternative, this Court should allow a trial on whether an enforceable arbitration agreement exists.

Respectfully submitted this 16th day of May 2025.

s/ *Jennifer B. Morton*
Jennifer B. Morton, BPR #015585
Summer H. McMillan, BPR #020296
**JENNIFER MORTON LAW, PLLC**
8217 Pickens Gap Road
Knoxville, TN 37920
(865) 579-0708
jen@jmortonlaw.com
summer@jmortonlaw.com

*Attorneys for Plaintiff Jennings*

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*s/ Jennifer B. Morton*

13